Filed 4/24/25  P. v. Morris CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TAMOYIA DUSHAWN MORRIS,<br><br>    Defendant and Appellant. | D083336<br><br>(Super. Ct. No. SCD214650) |


APPEAL from an order of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Kristen Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.


In 2013, a jury convicted Tamoyia Dushawn Morris of two counts of first degree felony murder, attempted robbery, burglary, five counts of false

imprisonment by violence, and possession of a firearm by a felon, and found true related gang and firearm enhancement allegations. The crimes stemmed from a 2005 home invasion that ended in the execution of two victims. Morris was sentenced to life without the possibility of parole for the crimes. After legislative reforms to the state's felony murder law, Morris petitioned for resentencing under Penal Code section 1170.95 (now section 1172.6).[1] The trial court issued an order to show cause and granted an evidentiary hearing to determine if Morris was eligible for relief. After the hearing, which relied on the evidence presented at Morris's original trial, the court determined Morris was ineligible for relief and denied the petition.[2]

On appeal from that denial, Morris asserts insufficient evidence supported the trial court's determination that he was either a major participant in the home invasion robbery who acted with reckless indifference to human life, or a direct aider and abettor of the murders. As we explain, we agree with the Attorney General that sufficient evidence supports a finding that Morris is ineligible for relief. Specifically, the DNA evidence presented at trial, the recorded interview of an informant, and testimony concerning the motive was sufficient to support a finding that Morris was one of several men that perpetrated the crimes. Other evidence, including the testimony of the surviving victims, was sufficient to support a finding that all of the perpetrators, including Morris, were major participants who acted with reckless indifference to human life. Accordingly, we affirm the court's order.

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     The superior court judge that presided over Morris's trial was the same judge to consider his petition for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background*

The criminal investigation in this case uncovered the existence of infighting that preceded the crimes within a San Diego gang known as Lincoln Park. Around the time of these crimes, Lincoln Park was a large gang, with 445 documented members, based in southeastern San Diego. At trial, Kenneth Freshwater, an experienced investigator with the District Attorney's office who was part of a violent crimes task force organized by the FBI, testified about Morris's relationship to the Lincoln Park gang and the infighting that occurred before the crimes in this case took place. This infighting was central to the prosecution's theory of the motive for the crimes.

Freshwater told the jury that as part of an investigation in 2004 and 2005, the violent crimes task force obtained warrants to wiretap the phones of two younger Lincoln Park gang members, Tyree "ZZ" Jabbar and Morris's cousin, Dana Purvis. Through wiretaps, Freshwater discovered older members of the gang were upset with some younger members, including Jabbar, who the older members felt were not paying their dues. Freshwater overheard a call between Purvis and Morris, in which Morris told his cousin that older members of the gang had tied up and robbed Jabbar in retaliation for not showing sufficient respect to the older gang members. During the call, Morris told Purvis that as an older member of the gang—Morris was in his mid-thirties at the time—he would be willing to take Jabbar under his wing, and provide protection from the other older gang members. Jabbar rejected Morris's offer and instead started working with another Lincoln Park gang crew.

Freshwater testified that after Jabbar began working with the other gang crew, a dispute erupted between Jabbar and a member of that crew,

Terrill Bell.  This dispute led to a shooting in the fall of 2004, when Jabbar fired gunshots at Bell in his car.  A member of the gang suppression unit of the San Diego Police Department, Scott Barnes, also testified about Jabbar's history with the Lincoln Park gang, and his relationship to Morris.  Barnes was involved in the arrest of another Lincoln Park gang member, Marquis Veal, in 2008, after a different gang-related shooting.  Veal agreed to be interviewed by detectives and corroborated Freshwater's testimony that Jabbar had shot at Bell's car.  Veal also explained that Bell, known to be extremely violent within the gang, had been following Jabbar before that shooting and Jabbar shot at Bell because he feared Bell would shoot him.  In the interview, Veal revealed that after that shooting, Bell retaliated by killing Jabbar's father in front of their family home.

In March 2005, Jabbar was arrested for drug trafficking.  At that time, Jabbar had moved out of the home where his father was killed and was living with his sister, Hana Jabbar, at her house on Velma Terrace.  The Velma Terrace home was within walking distance of the house where Jabbar's father was killed.  Hana rented rooms at the house and at the beginning of October 2005 rented a room to Stacey Adams and Preston, a married couple who were introduced to Hana by another of her and Jabbar's brothers, Meico McGhee.[3]  Before they moved into the Velma Terrace house, Stacey and Preston lived with another roommate, Sacha Newbern.  Stacey testified that Newbern was a prostitute, who both worked for McGhee and also had a romantic relationship with him.  Newbern moved into the Velma Terrace home a few weeks before Stacey and Preston.  Stacey also testified that

---

[3]    First names are used to avoid confusion for individuals who share the same last names.

4

McGhee spent most days at the house and sometimes spent the night there with Newbern.

B. *Murders*

A few weeks after moving into the Velma Terrace house, Stacey and Newbern were home alone and thought they saw someone outside the house looking into the bedroom windows. The following month, on November 25, 2005, the Friday after Thanksgiving, Stacey woke up in the morning when she a heard a noise. She and Newbern were the only ones at home, so she assumed it was Newbern.[4] When she got up and opened her bedroom door, she was confronted by a masked man holding a gun. He was African American and wearing overalls. The man told Stacey to get on the floor, then tied her arms and legs together behind her back. He also blindfolded Stacey with a bandana. Stacey heard other men in the house. The man who tied Stacey asked her, "where is the $500,000?"

Another man, who Stacey described as a lighter skin African American male, taller and thinner than the man who hog-tied her, asked Stacey where Hana was. She told the man Hana was at work. The two men brought Newbern into Stacey's room. Stacey heard the men talking to someone outside the house on a walkie-talkie like device, who was giving the men inside information about cars that were turning onto the street. Stacey also recalled the men were wearing gloves. She estimated three or four men were inside the house and one or two might have been assisting from outside. Stacey testified that she thought the men were using gang terms of their rivals, which sounded artificial to her, to mask who they were, and that when

---

[4]    Preston left the house for work that morning around 5:00 a.m. Hana had also already left the house in the early morning for work.

the men became agitated they used language she associated with Lincoln Park.

After tying Stacey, the men began ransacking the home. At some point, Stacey heard the men describe Preston's car over the walkie-talkies. Minutes later, Preston entered the house and one of the men, who was masked, put a gun to his face and told him to cooperate. The man walked Preston to his and Stacey's bedroom, where Stacey and Newbern were, with the gun at the back of his head. The men then blindfolded Preston and tied his arms and legs together. Preston believed at least three men were involved in the operation. Two men inside, both with guns, and one or more outside the house who were communicating on walkie-talkie like devices and relaying descriptions of passing cars. The men asked Preston if he knew where the money was hidden and he responded that he didn't know about any money. The men told Preston they knew how long he had lived at the house and had watched him taking out the trash.

Stacey testified that after Preston arrived, they heard the men say that McGhee was arriving. When McGhee entered, he did not comply with the robbers' demands and a fight erupted. Stacey heard bodies hitting walls, pictures falling, and glass breaking. She heard one of the men yell that McGhee had a gun. The men also demanded to know where Jabbar's money was hidden. Stacey testified that all of the men who had been inside seemed to be involved in the fight and they called on the walkie-talkie devices for the men outside to come help. Stacey and Preston heard McGhee moaning and heard them dragging McGhee into a nearby bathroom. They heard McGhee gurgling and having difficulty breathing. Stacey testified the men moved Newbern into her room at some point and Newbern was hysterical.

6

The perpetrators came back to the bedroom where they held Stacey, Preston, and Newbern, and told the captives "they were just looking for the money." At some point McGhee got up from the bathtub. Stacey heard one of the men state, "Oh shit. He's up" and then leave and tell McGhee to stay down and "don't end up like your father." At another point in the day, Stacey requested a cigarette and the man guarding her rolled her a cigarette and had Stacey lick the paper to close it, telling her he didn't want to leave his DNA behind.

Around 4:30 p.m., Hana arrived home from work. When she entered the house, she was met by a masked man who held a gun to her head. The man ordered her to the floor and tied her hands and feet. Hana testified two men demanded to know where the money Jabbar had hidden was. One of the men told Hana that if she told them where the money was, they would not kill McGhee. Hana then told the men there was money in the backyard in an effort to save McGhee's life. The robbers dug in the yard for about 15 minutes. Hana also showed one of the men a safe that was kept in the closet. She was blindfolded at times, but she was able to identify one of the men, Michael Mason, who was a long-time member of the Lincoln Park gang and was the same age as Morris.

Hana testified that shortly after showing the men the safe, the robbers murdered McGhee. The men poured gasoline on him in the bathtub and Hana could hear her brother begging for his life. She heard one of the men tell McGhee there would be no reprieve, and to "get ready to go with your father." The robbers then shot McGhee in the head twice.[5] The perpetrators then dragged Newbern into the bathroom. Preston testified Newbern was

---

[5] The subsequent autopsy of McGhee's body also revealed 15 blunt force trauma lacerations to his head and burns on his legs.

hysterical, screaming that she would rather be dead than live without McGhee. The men then shot Newbern in head.

Preston testified that during the executions, between gun shots, he heard the robbers talking about "putting in work," and one of the men tell one of the others, "you shoot too." Similarly, as the robbers searched the home, Stacey heard one tell another that he was not interested in being the only one willing to "get some dirt on his hands" and that all of the perpetrators needed to "put in work." Preston testified that after the killings, the men made efforts to sanitize the crime scene by vacuuming and cleaning the walls. After the men left, Preston, Stacey, and Hana freed themselves and ran to neighbors' homes to seek help.

Police arrived at the crime scene soon after the shootings. When they entered the house, officers smelled gasoline, most prominently in the bathroom. McGhee and Newbern were both slumped in the bathtub, Newbern on top of McGhee, and both were bound at the hands and feet and gagged. A napkin that had been set on fire was on McGhee's lap and touching Newbern's butt. Although both had been shot in the head, the officer heard attempts at breathing coming from the victims. The officer called for paramedics, who arrived and began life-saving intervention, which was not successful.

Homicide Detective Joseph Cristinziani processed the crime scene. Cristinziani testified the evidence suggested that the perpetrators "went to great pains" to sanitize the house. Cristinziani stated the use of a cleaning agent by the men suggested they wanted to remove any trace of their own DNA. Investigators, however, discovered a blood stain on the bathroom door. Based on the appearance of the stain, Cristinziani testified that he believed the door was "wiped" during the robbers' cleaning effort. Describing the

stain, he stated, "you could see a swipe mark much like if you're wiping something up on your kitchen counter but you don't get it all at once." A forensic evidence technician swabbed the swipe mark and collected it into evidence, marked as "Item 52."

Morris's DNA was present in the blood stain found on the outside of the bathroom door, and this fact was entered into evidence as a stipulation that read: "The people and the defense agree and stipulate that: San Diego Police Department Criminalist Ian Fitch analyzed an evidence swab, Item No. 52, for the presence of DNA. For purposes of this trial, the parties stipulate that [McGhee] is a major contributor to the DNA in Item No. 52. It is also stipulated that the defendant, Tamoyia Morris, is a minor contributor to the DNA in Item No. 52."

Fitch and a second expert in forensic DNA, Shawn Montpetit, testified about the characteristics of the DNA. Fitch explained to the jury that the lack of degradation and level of Morris's DNA on the sample suggested it was blood or bodily fluid that was deposited simultaneously with McGhee's blood. Fitch stated that he would have expected more degradation and the presence of less DNA if the DNA had been deposited at an earlier time from a simple touch of the surface. Similarly, Montpetit testified that there was no "significant degradation" difference between Morris's and McGhee's DNA on the sample. Montpetit opined that Morris's and McGhee's DNA were deposited "in close proximity in time to each other" because of the similarity in the levels of degradation present in the material. Both experts, however, recognized that it was not possible to say with certainty when the contributors' DNA was deposited.

Forensic technicians also collected a spent .38-caliber shell casing, a bullet from McGhee's head, the contents of a vacuum cleaner that included a

9

glass sliver with a substance resembling blood on it, and a cigarette butt containing Mason's DNA.

C. *Subsequent Investigation*

For several years, the murders went unsolved. Then, in 2008, Veal was arrested on ammunition charges during a parole search of his home related to a separate investigation. During an interview with Barnes and other detectives, Veal agreed to provide information about the Lincoln Park gang in exchange for assurances he could attend his grandmother's upcoming funeral. In the recorded interview, which was played for the jury, Veal detailed several other gang shootings.

After discussing the shootings, the detectives asked Veal about drug dealing endeavors. When the topic of conversation turned to Jabbar, Veal described the shooting by Jabbar at Bell's mother's car and Bell's retaliatory shooting and killing of Jabbar's father. Veal then turned to the "torture" and shooting that had occurred at the Velma Terrace house. Veal told the detectives that Bell said he was the shooter and his accomplices were Morris, Mason (who Hana had identified), and Elliott Perry, another Lincoln Park gang member.

Veal also told the detectives that after the Velma Terrace murders, the perpetrators became engaged in a feud, which culminated in the men "shooting at each other." Veal's statements coincided with events in 2007 that the police had investigated. On July 1, 2007, police responded to a disturbance call from Morris's mother. She reported that Morris, whom she knew was a Lincoln Park gang member, had been threatened by another gang member. Morris's mother told police that Mason, whom she believed to be wanted on multiple murder cases, had left Morris a threatening note and voice mail, which she gave to the officers. The note said Mason believed

10

Morris was a "snitch" and threatened to kill him and his family. Morris's mother told police Morris was frightened and behaving erratically. She also said when she suggested to Morris that they call police, he responded by taking her phone and throwing it out the window.

Another police investigator testified that a few weeks later, Mason committed a murder on Suncrest Drive in San Diego. Bullets were recovered from the shooting. A few weeks after that, Mason committed a drive-by shooting on Capistrano Avenue in Spring Valley. Mason shot holes in the front door of Perry's sister's home and a bullet was recovered from the scene.[6] When police chased Mason, he attempted to ditch the revolver that he used to commit the shootings, but the gun was recovered by police.

Detectives working the Velma Terrace murder case learned that in August of 2007, police responded to a call regarding gunshots at Morris's house and Morris had come out of his house to speak with officers. The detectives learned that the responding officers noticed bullet holes in the stucco of Morris's home. In 2008, detectives obtained a search warrant and dug three bullets out of the stucco. Forensic testing showed the bullets matched the gun Mason used to commit the Suncrest murder and the Capistrano drive-by shooting.

D. *Defense Evidence*

The defense presented the testimony of a DNA expert to refute the prosecutors' DNA experts. The defense expert testified that the DNA of Morris found in Item 52 showed some signs of degradation. The expert opined that Morris's DNA could have been left there sometime prior to the

---

[6]     Perry and Morris were similar in age and were known to be close friends. Detectives believed Perry and Morris were the targets of the drive-by shooting.

11

murders.  The defense also presented testimony from Jabbar, who stated that he and Morris had a good relationship and Morris had visited him at the Velma Terrace house in the past when Jabbar was staying there with his sister.  Jabbar also testified that he gave money to Morris and Morris had protected him.

E. *Verdict, Sentencing, & Appeal*

In 2013, a San Diego County jury convicted Morris of two counts of first degree murder in violation of Penal Code section 187, subdivision (a); attempted robbery in violation of sections 664 and 211; burglary in violation of section 459; five counts of false imprisonment by violence, in violation of sections 236 and 237, subdivision (a); and possession of a firearm by a felon in violation of former section 12021, subdivision (a)(1).  As to both murders, the jury made two special circumstance findings:  First, that each murder was committed while engaged in the commission and attempted commission of a robbery, within the meaning of section 190.2, subdivision (a)(17), and second, that each murder was committed while engaged in the commission and attempted commission of a burglary, within the meaning of section 190.2, subdivision (a)(17).  In addition, the jury also found that Morris committed all of the crimes for the benefit of, or in association with, a criminal street gang within the meaning of section 186.22, subdivision (b)(1); for the two murders and attempted robbery, that Morris was a principal, and that during the crime a principal used a handgun causing great bodily injury or death within the meaning of section 12022.53, subdivisions (d) and (e)(1); for the robbery, that the crime was in the first degree, within the meaning of section 213, subdivision (a)(1)(A); and for the burglary, that the crime was perpetrated in an inhabited dwelling, within the meaning of section 460 and that another

12

person other than an accomplice was present during commission of the crime, within the meaning of section 667.5, subdivision (c)(21).

The trial court sentenced Morris to two life sentences, without the possibility of parole, plus 75 years to life, plus a determinate 36 years and two months in state prison. Morris appealed the judgment of conviction and, in 2015, this court affirmed the conviction in an unpublished opinion. (*People v. Morris* (Feb. 23, 2015, D064450) [nonpub. opn].)

F. *Post-Judgment Proceedings*

On July 26, 2022, Morris petitioned the trial court to resentence him for his murder convictions under former section 1170.95 (now section 1172.6). On May 26, 2023, following appointment of counsel and briefing by the parties, the trial court issued an order to show cause. Thereafter, both parties submitted briefing that relied solely on the trial record.

The trial court conducted a hearing on November 17, 2023, at which counsel argued their positions. The prosecutor asserted Morris's conviction could stand on three theories: (1) Morris was a major participant who acted with reckless indifference to human life, (2) Morris directly aided and abetted implied malice murder, and (3) that some evidence suggested Morris was the actual killer. Morris's defense counsel responded there was insufficient evidence to convict him under the current standards because the DNA evidence was alone insufficient to show he was a major participant who acted with reckless indifference, and no evidence supported a finding that he was a direct aider or abettor, or that he was the actual killer. Following the parties' arguments, the court denied the petition.

Morris filed a timely notice of appeal from the court's denial.

# DISCUSSION

## I

### *Governing Law*

"Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) significantly limited the scope of the felony-murder rule and eliminated liability for murder under the natural and probable consequences doctrine through two key provisions.  (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).)  First, Senate Bill No. 1437 amended section 189 so that '[d]efendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were "major participant[s] in the underlying felony and acted with reckless indifference to human life." ' "  (*Strong*, at p. 708, citing § 189, subd. (e)(3).)  Second, it amended section 188 to provide that, when the felony-murder rule does not apply, a principal in the crime of murder can only be convicted where she acted 'with malice aforethought,' and '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.'  (§ 188, subd. (a)(3)[.])"  (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 122 (*Guiffreda*).)

Senate Bill No. 1437 also created a procedural mechanism "to allow defendants who could not have been convicted under the new law to petition the sentencing court to vacate their murder convictions and resentence them on any remaining counts.  (See § 1172.6, subd. (a); *Strong, supra*, 13 Cal.5th at p. 708.)  After receiving a petition containing the required information, 'the court must evaluate the petition "to determine whether the petitioner has made a prima facie case for relief." '  (*Strong*, at p. 708, citing § 1172.6, subd. (c).)  If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary

hearing to determine whether relief should be granted. (§ 1172.6, subds. (c), (d)(3).)" (*Guiffreda, supra*, 87 Cal.App.5th at p. 122.)

"Effective January 1, 2022, Senate Bill No. 775 (2020–2021 Reg. Sess.) (Senate Bill No. 775) amended section 1172.6 to clarify certain aspects of the law, including that (1) the burden of proof at a resentencing hearing under this section is 'on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder' under California law as amended by Senate Bill No. 1437 and (2) '[a] finding that there is substantial evidence to support a conviction for murder ... is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1172.6, subd. (d)(3); see also Stats. 2021, ch. 551, § 1, subd. (c).) Senate Bill No. 775 clarified that the trial court's role in a section 1172.6 proceeding is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder under the law as amended by Senate Bill No. 1437." (*Guiffreda, supra*, 87 Cal.App.5th at p. 123.)

"Under the amended felony-murder rule, a defendant who was not the actual killer and did not act with the intent to kill can only be liable for murder if she was a major participant in the underlying felony and acted with reckless indifference to human life. (*Strong, supra*, 13 Cal.5th at p. 708, citing § 189, subd. (e)(3).)" (*Guiffreda, supra*, 87 Cal.App.5th at p. 123.) " '[T]he standard under section 189, subdivision (e)(3) for holding ... a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2[, subdivision] (d), as the former provision expressly incorporates the latter.' [Citation.] Accordingly, death penalty cases interpreting section 190.2, subdivision (d), including *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th

15

522 (*Clark*), are controlling here." (*Guiffreda, supra*, 87 Cal.App.5th at
p. 123.)

## II

### *Standard of Review*

On appeal from the denial of a petition for resentencing after an
evidentiary hearing, "[w]e review the trial court's factual findings for
substantial evidence and the court's application of those facts de novo."
(*People v. Wilson* (2023) 90 Cal.App.5th 903, 916.)  "In conducting our review,
we consider the whole record in the light most favorable to the superior
court's findings [citation], and we presume ' " 'every fact in support of the
judgment the trier of fact could have reasonably deduced from the
evidence.' " '  [Citation.]  We ask 'whether substantial evidence, defined as
reasonable and credible evidence of solid value, has been disclosed,
permitting the trier of fact to find guilt beyond a reasonable doubt.'
[Citation.]  And based on this whole record review, we ' "determine whether
*any* rational trier of fact could have found the essential elements of the crime
... beyond a reasonable doubt." ' "  (*People v. Hill* (2024) 100 Cal.App.5th
1055, 1066.)

## III

### *Analysis*

At the evidentiary hearing, the court did not explain the basis for its
denial of the petition.  Rather, at the conclusion of the hearing the court
stated only that it agreed "with the People's position, so that the request for
relief is denied."  On appeal, Morris asserts there was insufficient evidence to
support any of the three theories of liability advanced by the prosecution.

As we shall explain, we agree with the Attorney General that the trial
evidence sufficiently supported the prosecutor's theory that Morris was a

16

major participant who acted with reckless indifference to human life during the home invasion attempted robbery. Because we conclude substantial evidence supports the court's finding beyond a reasonable doubt on this theory, we need not reach the Attorney General's alternate assertion on appeal that Morris was a direct aider and abettor who acted with implied malice.[7]

A

*The Evidence Supports the Trial Court's Finding That*
*Morris Was a Major Participant in the Underlying Felony*

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major." ' " (*Clark, supra*, 63 Cal.4th at p. 611.) To assist in answering this question, the California Supreme Court in *Banks* articulated the following considerations: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?"

---

[7] Although at the evidentiary hearing the prosecutor also asserted there was evidence Morris was the actual killer, the Attorney General concedes on appeal that "any argument that sufficient evidence exists … that [Morris] acted as the actual killer would be thin, if not disingenuous." We agree with the parties that given the manner the case was prosecuted there is insufficient evidence to support a finding Morris was the actual killer.

(*Banks, supra*, 61 Cal.4th at p. 803.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

Of these factors, the most critical in the present case is the fourth, particularly whether Morris was present at the scene.  The determination of whether Morris was a major participant turns on whether there is sufficient evidence to support the trial court's implicit finding that Morris was one of the perpetrators of the crimes, i.e. that he was present and participated in the hours-long ordeal at the Velma Terrace house.  Without evidence of this fact, Morris argues, there would not be sufficient evidence to conclude he was a major participant in the crimes.  In his briefing, Morris points to the weaknesses in the evidence supporting a finding that he was present, specifically what he describes as weakness in the DNA evidence and the fact that none of the surviving victims identified him as one of the perpetrators.

Despite the lack of eyewitness testimony, however, we agree with the Attorney General that the evidence presented at trial did support the finding that Morris was inside the Velma Terrace house and was one of the men who perpetrated the crimes.  Specifically, the presence of Morris's DNA at the scene mixed with McGhee's DNA; the prosecution experts' testimony concerning the characteristics of the DNA evidence, which suggested Morris's DNA came from his blood (and not from Morris's presence at the house at some earlier time) and showed that Morris's DNA was deposited on the door at the same time as McGhee's DNA; the recorded interview of Veal in which he identified Morris as one of four perpetrators; and the circumstantial evidence linking Morris to the crimes through his involvement in the Lincoln Park gang and the infighting that preceded and followed the crimes. Further, none of the surviving witnesses testified that any of the perpetrators appeared to leave the house at any point until *after* the murders occurred.

18

This evidence sufficiently supported the trial court's finding, beyond a reasonable doubt, that Morris was one of the men that orchestrated and perpetrated the attempted robbery and murders that occurred on November 25, 2005.

Because we conclude that sufficient evidence supports a finding that Morris was one of the perpetrators of these crimes, we turn to the other *Banks* factors. The first is the role the defendant played in planning the home invasion that led to the murder of McGhee and Newbern. (See *In re Harper* (2022) 76 Cal.App.5th 450, 459 (*Harper*).) The surviving victims' testimony shows that the perpetrators worked together pursuant to a planned invasion. The men wore masks and gloves to conceal their identities, cased the home before the crimes, and ambushed the victims with guns, first Stacey when she opened the door, then Newbern inside the home, and Preston, McGhee, and Hana in turn when they arrived. The perpetrators posted someone outside the house to keep watch and communicate with the men inside, which also showed that the crimes were well coordinated and planned. Further, the men thoroughly cleaned the house, vacuuming and wiping down walls. This was significant circumstantial evidence that as one of the perpetrators of the crimes, Morris was involved in the planning of the home invasion that led to the murders. This factor favors a finding that Morris was a major participant.

The second *Banks* factor is the role of the defendant in supplying or using lethal weapons. (See *Harper, supra*, 76 Cal.App.5th at p. 459.) As Morris asserts on appeal, there was no direct evidence that he used a gun or supplied the guns that were used. However, the circumstantial evidence surrounding the crimes, specifically the surviving victims' testimony about the participants' behavior during the day, suggests that all the men that were

present were armed. Specifically, the men used their weapons to intimidate and threaten the surviving victims and force them into submission. In addition, the characteristics of Morris's DNA—i.e., that the sample was likely from Morris's blood and was deposited around the same time or simultaneously as McGhee's blood—suggested Morris was directly involved in McGhee's beating, his death, or minimally the cleanup of the murder. Further, the surviving victims testified they heard statements from the men that suggested all of the perpetrators took part in the beatings of McGhee and his subsequent killing. While there is no direct evidence on this factor, the circumstantial evidence concerning the method in which the crimes were committed suggests Morris's culpability under the second *Banks* factor.

The third factor is the defendant's awareness of the particular dangers posed by the home invasion robbery, the weapons used, and past experience or conduct of the other participants. (See *Harper, supra*, 76 Cal.App.5th at p. 459.) As discussed, Morris was an older gang member who was involved in the infighting with the gang's younger members, including McGhee's brother Jabbar. Morris pressed his cousin, Purvis, to persuade Jabbar to pay Morris a tax for protection after Jabbar was robbed by another faction of the gang. Jabbar's refusal of this offer angered Morris. Soon thereafter, Bell murdered Jabbar's father by shooting him in the head. This evidence supports a finding that Morris, an active member of the Lincoln Park gang, knew Bell, an alleged cohort in the crimes, was exceptionally violent and would not hesitate to kill another human being with a gun. The evidence showed Morris was aware of Bell's violence, gun possession, and the danger that

20

would be posed to the victims of the home invasion. The third *Banks* factor supports a finding that Morris was a major participant in the crimes.[8]

The fifth factor addresses the defendant's conduct after the executions took place. (See *Harper, supra*, 76 Cal.App.5th at p. 459.) Again, the evidence related to this factor weighs in favor of finding Morris was a major participant in the crimes. Before departing, the perpetrators took steps to sanitize the crime scene, vacuuming and cleaning the walls. Stacey testified that one of the men stated he did not want to leave his DNA behind. No evidence suggested that any of the perpetrators took any action to leave or help any of the victims. Instead, the evidence showed that all the men that were present during the day-long ordeal participated in the crimes, the executions of two victims, and an effective cleanup of the aftermath.

Taking into consideration all of the *Banks* factors, particularly the evidence supporting a finding that Morris was present and one of the perpetrators of these crimes, we agree with the Attorney General that sufficient evidence supported the trial court's implicit finding that Morris was a major participant in the attempted robbery and home invasion that led to the two murders at issue.

---

[8] Morris asserts that there "was nothing in the record to show [his] relationship with the other perpetrators or his knowledge of their propensity for violence." This assertion is belied by the record. The prosecution's gang experts testified that Morris was a known and long-time member of Lincoln Park and had a close relationship with at least one other of the alleged perpetrators of these crimes.

B

*The Evidence Supports the Trial Court's Finding*
*That Morris Acted with Reckless Indifference to Human Life*

"Reckless indifference to human life has a subjective and an objective element.  [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'  [Citations.]  As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." '  [Citation.]  'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement."  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

Similar to the factors set forth in *Banks* for determining whether a defendant is a major participant in the felonies, in *Clark, supra*, 63 Cal.4th 522, the California Supreme Court articulated a list of considerations for determining whether a defendant acted with reckless indifference to human life.  The court held that several factors are critical to this determination: "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's

22

knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*Scoggins, supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, at pp. 618–623].)

The factors for evaluating reckless indifference " 'significantly overlap' " with the factors defining a major participant, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark, supra*, 63 Cal.4th at p. 615.)  As with the major participant factors, " '[n]o one of [the reckless indifference] considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id*. at p. 618.)  "We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life." (*Scoggins, supra*, 9 Cal.5th at p. 677.)

The United States Supreme Court has "stressed the importance of presence to culpability." (*Clark, supra*, 63 Cal.4th at p. 619, citing *Tison v. Arizona* (1987) 481 U.S. 137, 158.)  Where "the murder is a culmination or a foreseeable result of several intermediate steps …, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state.  …  [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.  If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark*, at p. 619.)

Considering the totality of the circumstances, we conclude substantial evidence supports the court's implicit finding that Morris acted with reckless indifference to human life.  As with the fourth *Banks* factor, whether Morris was present at the Velma Terrace house throughout the day of terror that

23

culminated in two murders, is critical to determining if he acted with reckless indifference. As discussed, we agree with the Attorney General that there is sufficient evidence to support the trial court's implicit finding that Morris was present as a major participant in the crimes. Again, the DNA evidence, the testimony of investigators who discovered the infighting and crimes that preceded the Velma Terrace murders, Veal's interview, and the testimony of other witnesses corroborating Veal's account of the violence following the murders, was sufficient to support the finding that Morris was physically present at Velma Terrace during the crimes that culminated in the killing of McGhee and Newbern.

Turning to the other *Clark* factors, as to the first—Morris's awareness that a gun would be used, whether he personally used a gun, and the number of guns used in the home invasion robbery (see *Scoggins, supra*, 9 Cal.5th at p. 677)—the evidence presented at trial concerning this factor supports a finding that Morris acted with reckless indifference. As noted, the three surviving victims of the day-long ordeal testified they were held at gunpoint, both McGhee and Newbern were held at gunpoint, and both murder victims died by gunshot. Especially in light of the significant length of the time the victims were subjected to these crimes, which unquestionably involved the use of at least one firearm, it is reasonable to conclude Morris was involved in, or minimally aware of, the gun or guns that were used.

The next *Clark* factor considers the defendant's proximity to the murders and the events leading up to them, including whether the defendant had the opportunity to restrain the perpetrators of the crime or aid the victims. (*Harper, supra*, 76 Cal.App.5th at p. 460.) Because we agree that the evidence sufficiently supported a finding that Morris was present throughout the day, the circumstantial evidence presented at trial in the

24

form of the three surviving victims' testimony concerning what they heard and witnessed, shows that Morris and the other men who were present had the opportunity to restrain the crimes or aid the victims and none did so. To the contrary, the men encouraged each other to participate in the crimes, to "get some dirt on [their] hands," and to "put in work." Further, the evidence showed the robbers collectively beat McGhee into submission and forced him into the bathtub where he was executed. This factor strongly weighs in favor of a finding that Morris acted with reckless indifference to human life.

The next *Clark* factor examines whether the murders took place at the end of a prolonged period of restraint of the victims by the defendant. (*Harper, supra*, 76 Cal.App.5th at p. 460.) The evidence shows this was an hours-long home invasion robbery. The victims were held at gunpoint and bound. Three victims were hogtied, Hana was restrained, and McGhee was severely beaten and forced into a bathtub, all while the robbers searched the house for money. Moreover, when McGhee began to rise from the bathtub, he was subjected to additional beating, doused with gasoline, and shot in the head. Over this prolonged period of time, none of the perpetrators, including Morris, ever changed course. The evidence related to this factor also weighs heavily in support of a finding that Morris acted with reckless indifference to human life.

The final *Clark* factors are the defendant's knowledge of his cohort's likelihood of killing and the defendant's efforts to minimize the violence. (*Harper, supra*, 76 Cal.App.5th at p. 460.) The circumstantial evidence presented at trial concerning the relationships of the perpetrators, one of whom was identified by Hana, the gang infighting before the murders supplying the motive for the crimes, and the violence that occurred after the murders, showed Morris was aware of the other perpetrators' propensities for

25

violence and killing.  Further, no evidence at trial showed that any of the perpetrators took any step to minimize the violence.  To the contrary, the testimony of the surviving victims showed the men encouraged each other to commit violent acts, including two execution-style murders.  The evidence concerning these final *Clark* factors strongly supports a finding that Morris's participation in the crimes was done with reckless indifference to human life.

In sum, we agree with the Attorney General that the evidence in the record before the trial court sufficiently supports its implicit finding that Morris was present at the scene, was one of four men who perpetrated these crimes, and that he was a major participant who acted with reckless indifference to human life in the attempted robbery and home invasion that culminated in the murders of McGhee and Newbern.

## DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:

DATO, J.

DO, J.

26